MDR

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| Arthur L. Johnson, | ) | No. CV 1-08-1183-DCB P |
| | ) | |
| Plaintiff, | ) | **ORDER** |
| | ) | |
| vs. | ) | |
| | ) | |
| Dr. Ortiz, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**I.     Background**

Plaintiff Arthur L. Johnson is confined in the Correctional Training Facility in Soledad, California. In an October 8, 2009 Order, the Court screened Plaintiff's First Amended Complaint and dismissed without prejudice Defendants Ortiz, Salazar, Kushner, Emler, Castillo,Vilaysane, Diep, and Doehring because Plaintiff had failed to state a claim against them. The Court stated that Plaintiff had stated a claim against members of the medical review committee or against the individual at the California Department of Corrections and Rehabilitation (CDCR) who allegedly created or implemented a policy of permitting the committee to arbitrarily deny prescribed treatments. However, because Plaintiff had identified these individuals only as "Doe" Defendants, the Court gave Plaintiff 30 days to file a Response to the Order, that included

> either (1) the name of at least one member of the medical review committee or the individual who implemented the CDCR policy **or** (2) an explanation of what Plaintiff has done to try to learn their names, a description of what discovery he would undertake

JDDL

to learn their names, and the identity of at least one person who could be served with discovery.

In a December 8, 2009 Order, the Court granted Plaintiff's November 25, 2009 Motion for Extension of Time and gave Plaintiff until December 28, 2009 to file the names of the Doe Defendants.

On December 9, 2009, Plaintiff filed a "Notice to File Third Amended Complaint." In that document, Plaintiff requested leave to file a third amended complaint, noting that he had determined the name of one of the Doe Defendants and stating that a amended complaint would rectify his failure to "adequately reference [Defendants] Ortiz, Emler, Kushner, Doehring, Vilaysane and Diep with the cause of action." Plaintiff sought an extension of time until February 3, 2010 to file his amended complaint. On December 24, 2009, Plaintiff filed a "Response" in which he identified three of the Doe Defendants, asserted that he had failed to "adequately reference [Defendants] Ortiz, Kushner, Vilaysane, Diep, Salazar, Castillo, and Nurse Practitioners Doehering, and Emler," and indicated that he was currently creating a third amended complaint that he intended to file in late January or mid-February 2010.

In a January 21, 2010 Order, the Court gave Plaintiff until February 3, 2010 to file an amended complaint. On January 25, 2010, Plaintiff filed a "Notice of Third Amended Complaint" (Doc. #20) and attached his Third Amended Complaint to the Notice.[1] Although the Third Amended Complaint was unsigned, Plaintiff submitted a January 29, 2010 Notice (Doc. #21), noting that he had inadvertently failed to sign the Third Amended Complaint and attaching a signed final page of the Third Amended Complaint. The signed final page shall serve as an original signature on Plaintiff's Third Amended Complaint for the purposes of Rule 11 of the Federal Rules of Civil Procedure.

. . . .

. . . .

---

[1] The January 25th document is, in actuality, Plaintiff's "second" amended complaint. Nevertheless, because Plaintiff refers to the January 25th document as the "Third" Amended Complaint, the Court, for purposes of clarity, will do the same.

**II.     Statutory Screening of Prisoner Complaints**

The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or an officer or an employee of a governmental entity. 28 U.S.C. § 1915A(a). The Court must dismiss a complaint or portion thereof if a plaintiff has raised claims that are legally frivolous or malicious, that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b)(1), (2).

A pleading must contain a "short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (emphasis added). While Rule 8 does not demand detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 1950. Thus, although a plaintiff's specific factual allegations may be consistent with a constitutional claim, a court must assess whether there are other "more likely explanations" for a defendant's conduct. Id. at 1951.

**III.     Third Amended Complaint**

An amended complaint supersedes the original complaint and prior amended complaints. Ferdik v. Bonzelet, 963 F.2d 1258, 1262 (9th Cir. 1992); Hal Roach Studios v. Richard Feiner & Co., 896 F.2d 1542, 1546 (9th Cir. 1990). After amendment, the Court treats the original Complaint and all prior amended complaints as nonexistent. Ferdik, 963

1  F.2d at 1262. Thus, the Court will consider only those claims raised in the Third Amended
2  Complaint against only those Defendants named in the Third Amended Complaint.

3       In his Third Amended Complaint, Plaintiff sues the following Defendants: Doctors
4  Ortiz, Salazar, Kushner, Castillo, Vilaysane, and Diep; Nurse Practioners Emler and
5  Doehring; and Registered Nurse Corona. Plaintiff alleges that Defendant Corona is a
6  utilization management nurse "responsible for all [Utilization Management] Review
7  Processing for health care services for all prisoners at [Pleasant Valley State Prison-
8  Coalinga]."

9       Plaintiff alleges that the Court has federal question jurisdiction over his claim under
10 42 U.S.C. § 1983 and invokes the Court's supplemental jurisdiction over his state court
11 claims of negligence/malpractice and failure to discharge a mandatory duty.

12      Plaintiff makes the following allegations:

13     1.    On January 13, 2005, Plaintiff, after complaining about rapid
14         heartbeat and weight loss, was seen by Defendant Ortiz. Defendant Ortiz ordered a blood test.

15     2.    On February 1, 2005, Defendant Ortiz informed Plaintiff that the
16         blood test showed a positive result for hypothyroidism, prescribed a thyroid medication, and scheduled a follow-up
17         appointment in a month. On February 25th, Defendant Ortiz examined Plaintiff, who had twice complained about increased
18         heart palpitations and other symptoms, and informed Plaintiff that he would be scheduled to see an "expert" who would perform a thyroid scan.
19

20     3.    On April 26, 2005, Plaintiff was taken to a hospital to see an endocrinologist, but the endocrinologist was unable to conduct
21         the thyroid scan because prison medical staff had not informed Plaintiff that he needed to stop his thyroid medication before the
22         scan. The endocrinologist advised medical staff to stop Plaintiff's medication for six weeks.

23     4.    On June 13, 2005, Plaintiff was told that he would be getting a thyroid scan. On June 15th, Plaintiff informed a nurse that he
24         was experiencing severe heart palpitations, constant shortness of breath, and fatigue. The nurse told Plaintiff that his complaints
25         would be reported to Defendant Ortiz. The nurse also informed Plaintiff that the thyroid scan appointment had been cancelled
26         by Defendant Corona. On June 17th, Plaintiff received "lab work" and was informed that he would be started back on this
27         thyroid medication. On July 5th, Plaintiff was seen by Defendant Ortiz, who informed Plaintiff that the results of the
28         June 17th lab work were not in Plaintiff's file. Defendant Ortiz told Plaintiff to "try and relax."

5. On August 11, 2005, Plaintiff received a thyroid scan. On September 8th, Plaintiff complained of severe heart palpitations, was evaluated by a nurse, was informed that he potentially had cardiac arrhythmia, and was returned to his cell. On September 9th, Defendant Ortiz saw Plaintiff, informed Plaintiff that he needed to have his thyroid medication restarted, and stated that he would review the results of the thyroid scan and would see Plaintiff "soon."

6. On September 16, 2005, Defendant Salazar saw Plaintiff. Plaintiff informed Defendant Salazar of his health problems, but Defendant Salazar made no diagnosis and simply told Plaintiff to take care of himself. On October 12th, Plaintiff was supposed to meet with Defendant Salazar to review the thyroid scan report, but the report had been misplaced, and Plaintiff's appointment was rescheduled.

7. On December 12, 2005, Defendant Kushner reviewed the thyroid scan report with Plaintiff and informed Plaintiff that he needed Ablation therapy (Ablation) and that his heart palpitations and arrhythmia were caused by Plaintiff's hyperthyroidism.

8. On February 16, 2006, Defendant Emler informed Plaintiff that his thyroid was abnormally large, his uptake was abnormal, and his palpitations were due to cardiac problems. Defendant Emler informed Plaintiff that he would see an endocrinologist as soon as possible and requested a thyroid uptake test for the following week.

9. On March 3, 2006, an endocrinologist saw Plaintiff, informed Plaintiff that he needed immediate Ablation, and told Plaintiff that prison staff would have to "schedule the correct process so that Plaintiff could obtain the medication and correct treatment and follow up."

10. On March 16, 2006, Defendant Castillo met with Plaintiff. Plaintiff informed Defendant Castillo of his symptoms and informed Defendant Castillo that the endocrinologist had recommended Ablation. Defendant Castillo discontinued Plaintiff's thyroid medication and prescribed a different medication. He did not start Ablation.

11. On April 12, 2006, Defendant Castillo informed Plaintiff that Defendant Castillo was requesting a blood test and that Plaintiff would soon be receiving Ablation. The blood test was performed on May 2nd.

12. On June 1, 2006, Defendant Castillo saw Plaintiff, told him that he would be given Ablation very soon based on the result of the blood test, and advised Plaintiff to stop taking his medication so another test could be performed. A blood test was performed on July 5th and a thyroid stimulation hormone test (TSH) was performed on July 17th.

13. On August 3, 2006, Plaintiff saw Defendant Emler to discuss Ablation treatment. On August 16th, Plaintiff saw Defendant Castillo, complained about his symptoms, and pleaded to start receiving Ablation.

14. On August 24, 2006, Defendant Vilaysane saw Plaintiff, placed Plaintiff back on medication, and ordered another TSH test. On September 14th, Plaintiff went to the medical department because his heart was racing, his vision was blurry, and he was dizzy. A nurse informed him that he would soon be given Ablation.

15. On September 20, 2006, the endocrinologist saw Plaintiff, explained that Plaintiff needed to be started on Ablation, and stated that repeated consultations were unnecessary because hyperthyroidism had already been diagnosed. Plaintiff was placed back on medication.

16. On September 26, 2006, Plaintiff saw Defendant Vilaysane to discuss scheduling Plaintiff for Ablation. On October 25th, Defendant Vilaysane informed Plaintiff that he would be seen by an endocrinologist soon for a followup. On November 15th, Defendant Vilaysane told Plaintiff that he needed another TSH test and a cardiac exam. On December 6th, Defendant Vilaysane explained that the TSH test results were high and that Plaintiff was at risk for a heart attack. Plaintiff explained that the endocrinologist had stated in September that Plaintiff should have been started on Ablation as soon as possible. Defendant Vilaysane ordered more blood tests.

17. On February 2, 2007, Defendant Vilaysane examined Plaintiff, told Plaintiff that he was scheduled to see an endocrinologist, and that he was suffering from anemia. Defendant Vilaysane ordered more blood tests.

18. On February 14, 2007, Plaintiff saw the endocrinologist, who stated that he was very disappointed that prison medical staff had not given Plaintiff Ablation and stressed that it was extremely important for Plaintiff to have the treatment. The endocrinologist recommended that Plaintiff at least restart the thyroid medication.

19. On March 16, 2007, Defendant Vilaysane saw Plaintiff and told Plaintiff that he would see the endocrinologist again soon. Defendant Vilaysane discontinued Plaintiff's thyroid medication after Plaintiff complained of hot and cold flashes.

20. On March 25, 2007, after complaining of constipation, confusion, and pain, Plaintiff was seen by Defendant Diep, who opined that the constipation was caused by Plaintiff's hyperthyroidism and submitted a request for Plaintiff to see an endocrinologist.

. . . .

. . . .

1
2
3
    21.    On April 12, 2007, Plaintiff saw Defendant Doehring, who reviewed Plaintiff's medical file and determined that he needed Ablation, ordered Plaintiff's test results, and prescribed a medication for Plaintiff's heart palpitations.

4
5
6
7
8
    22.    On July 22, 2007, Plaintiff was having heart palpitations, was diagnosed with coronary ischemic arrhythmia, and received nitroglycerine while en route to a medical center. At the medical center, the doctor explained that Plaintiff was suffering from Bradycardia "as a result of the hyperthyroid condition that he had been left in for years." The doctor stated that Plaintiff should receive Ablation as soon as possible, the thyroid medication should be discontinued, and the heart palpitation medication probably caused damage to Plaintiff's heart.

9
10
    23.    On July 31, 2007, Plaintiff saw Defendant Doehring and explained that his symptoms were ongoing and that he had repeatedly requested and been prescribed Ablation. Defendant Doehring stated that she was doing all she could.

11
12
13
    24.    On September 27, 2007, Plaintiff was seen at a radiology medical group and was given a thyroid uptake scan. It was again concluded that Plaintiff should receive Ablation as soon as possible.

14
    25.    On October 3, 2007, Defendant Doering stated that Plaintiff would be getting Ablation.

15
16
    26.    On November 8, 2007, twenty-three months after Defendant Kushner first informed Plaintiff that he needed Ablation, Plaintiff received Ablation.

17 Plaintiff also alleges that the California Department of Corrections and Rehabilitation

18 (CDCR) "has a policy where a Doctor will personally diagnose a patient, prescribe

19 medication and treatment, and a CDCR committee will override the diagnosis and

20 recommendation for medication and do so without any input or communication with an

21 inmate or the doctor that originally set forth a plan of treatment."

22 Plaintiff contends that the following "cumulated into a series of incidents amounting

23 into countless delays, denials and intentional interferences of Plaintiff's access to qualified

24 medical personnel constituting deliberate indifference to Plaintiff's serious medical

25 condition": (1) the actions of Defendants Ortiz and Corona from April 26, 2005 through

26 September 9, 2005; (2) the actions of Defendants Kushner, Salazar, Emler, and Castillo from

27 September 16, 2005 through August 16, 2006; and (3) the actions of Defendants Vilaysane,

28 Diep, and Doehring from August 24, 2006 through November 8, 2007.

1    Plaintiff asserts that Defendants Ortiz, Corona, Kushner, Salazar, Emler, Castillo,
2  Vilaysane, Diep, and Doehring (1) "failed to discharge their mandatory duty pursuant to
3  California Government Code § 815.6, which is [to not] inflict any treatment or allow any lack
4  of care, . . . which would injure or impair the health of any prisoner in their custody"; and (2)
5  were negligent under California law because they "failed to use such skill, prudence and
6  diligence as other members of the medical profession commonly possess and exercise."

7    Plaintiff seeks monetary damages and his costs.

8  **IV.   Failure to State a Claim**

9    Not every claim by a prisoner that he has received inadequate medical treatment states
10  a violation of the Eighth Amendment.  To state a § 1983 medical claim, a plaintiff must show
11  that the defendants acted with "deliberate indifference to serious medical needs."  Jett v.
12  Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 104
13  (1976)).  A plaintiff must show (1) a "serious medical need" by demonstrating that failure
14  to treat the condition could result in further significant injury or the unnecessary and wanton
15  infliction of pain and (2) the defendant's response was deliberately indifferent.  Jett, 439 F.3d
16  at 1096 (quotations omitted).

17    To act with deliberate indifference, a prison official must both know of and disregard
18  an excessive risk to inmate health; the official must both be aware of facts from which the
19  inference could be drawn that a substantial risk of serious harm exists and he must also draw
20  the inference.  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  Deliberate indifference in the
21  medical context may be shown by a purposeful act or failure to respond to a prisoner's pain
22  or possible medical need and harm caused by the indifference.  Jett, 439 F.3d at 1096.
23  Deliberate indifference may also be shown when a prison official intentionally denies, delays,
24  or interferes with medical treatment or by the way prison doctors respond to the prisoner's
25  medical needs.  Estelle, 429 U.S. at 104-05; Jett, 439 F.3d at 1096.

26    "Deliberate indifference is a high legal standard."  Toguchi v. Chung, 391 F.3d 1051,
27  1060 (9th Cir. 2004).  Deliberate indifference is a higher standard than negligence or lack of
28  ordinary due care for the prisoner's safety.  Farmer, 511 U.S. at 835.  Medical malpractice

1  or negligence is insufficient to establish an Eighth Amendment violation. Toguchi, 391 F.3d
2  at 1060. Thus, mere negligence in diagnosing or treating a condition does not violate the
3  Eighth Amendment. Id. at 1057. Also, an inadvertent failure to provide adequate medical
4  care alone does not rise to the Eighth Amendment level. Jett, 429 F.3d at 1096. A mere
5  delay in medical care, without more, is insufficient to state a claim against prison officials
6  for deliberate indifference. See Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d
7  404, 407 (9th Cir. 1985). The indifference must be substantial. The action must rise to a
8  level of "unnecessary and wanton infliction of pain." Estelle, 429 U.S. at 105-06.

9  Plaintiff has failed to state an Eighth Amendment claim against Defendants Ortiz,
10 Salazar, Kushner, Castillo, Vilaysane, Diep, Emler, and Doehring because their individual
11 conduct does not rise to the level of deliberate indifference to Plaintiff's serious medical
12 needs. See Iqbal, 129 S. Ct. at 1948 ('[A] plaintiff must plead that each Government-official
13 defendant, through the official's own individual actions, has violated the Constitution.").
14 The Court, therefore, will dismiss without prejudice Plaintiff's Eighth Amendment claim
15 against Defendants Ortiz, Salazar, Kushner, Castillo, Vilaysane, Diep, Emler, and Doehring.

16 **V.   Claims for Which an Answer Will be Required**

17 Liberally construed, Plaintiff has stated an Eighth Amendment claim against
18 Defendant Corona, whom Plaintiff contends cancelled Plaintiff's June 2005 thyroid scan
19 appointment and is "responsible for all [Utilization Management] Review Processing for
20 health care services for all prisoners" at Pleasant Valley State Prison-Coalinga. Presumably,
21 Plaintiff is alleging that Defendant Corona is a member of the CDCR committee that
22 "override[s] the diagnosis and recommendation for medication and do[es] so without any
23 input or communication with an inmate or the doctor that originally set forth a plan of
24 treatment." The Court will require Defendant Corona to answer the Eighth Amendment
25 deliberate indifference claim.

26 In addition, liberally construed, Plaintiff has stated state law claims under California
27 Government Code § 815.6 and for negligence/malpractice against Defendants Ortiz, Corona,
28

Kushner, Salazar, Emler, Castillo, Vilaysane, Diep, and Doehring.  The Court will require these Defendants to answer the state law claims against them.

## VI.    Warnings

### A.    Address Changes

Plaintiff must file and serve a notice of a change of address in accordance with Rule 83-182(f) and 83-183(b) of the Local Rules of Civil Procedure.  Plaintiff must not include a motion for other relief with a notice of change of address.  Failure to comply may result in dismissal of this action.

### B.    Copies

Plaintiff must submit an additional copy of every filing for use by the Court.  See LRCiv 5-133(d)(2).  Failure to comply may result in the filing being stricken without further notice to Plaintiff.

### C.    Possible Dismissal

If Plaintiff fails to timely comply with every provision of this Order, including these warnings, the Court may dismiss this action without further notice.  See Ferdik, 963 F.2d at 1260-61 (a district court may dismiss an action for failure to comply with any order of the Court).

**IT IS ORDERED:**

(1)    Plaintiff's Eighth Amendment claim against Defendants Ortiz, Salazar, Kushner, Castillo, Vilaysane, Diep, Emler, and Doehring is **dismissed** without prejudice.

(2)    Defendant Corona must answer Plaintiff's Eighth Amendment claim and Defendants Ortiz, Corona, Kushner, Salazar, Emler, Castillo, Vilaysane, Diep, and Doehring must answer Plaintiff's state law claims.

(3)    The Clerk of Court must send Plaintiff a service packet including the Third Amended Complaint (Doc. #20), this Order, a Notice of Submission of Documents form, an instruction sheet, and copies of summons and USM-285 forms for Defendants Ortiz, Corona, Kushner, Salazar, Emler, Castillo, Vilaysane, Diep, and Doehring.

1    (4)    Within **30 days** of the date of filing of this Order, Plaintiff must complete and return to the Clerk of Court the Notice of Submission of Documents. Plaintiff must submit with the Notice of Submission of Documents: a copy of the Third Amended Complaint for each Defendant, a copy of this Order for each Defendant, a completed summons for each Defendant, and a completed USM-285 for each Defendant.

(5)    Plaintiff must not attempt service on Defendants and must not request waiver of service. Once the Clerk of Court has received the Notice of Submission of Documents and the required documents, the Court will direct the United States Marshal to seek waiver of service from each Defendant or serve each Defendant.

(6)    **If Plaintiff fails to return the Notice of Submission of Documents and the required documents within 30 days of the date of filing of this Order, the Clerk of Court must, without further notice, enter a judgment of dismissal of this action without prejudice.** <u>See</u> **Fed. R. Civ. P. 41(b).**

DATED this 11th day of February, 2010.

David C. Bury
United States District Judge