1

2

3

4

5

6          IN THE UNITED STATES DISTRICT COURT

7        FOR THE EASTERN DISTRICT OF CALIFORNIA

8

9    Arthur L. Johnson,                     )    No. CV 1-08-1183-DCB P
                                            )
10            Plaintiff,                     )    **ORDER**
                                            )
11   vs.                                     )
                                            )
12   Dr. Ortiz, et al.,                      )
                                            )
13            Defendants.                    )
                                            )
14   _____

15          Defendants' Motion to Dismiss is before the Court.  In response, Plaintiff has filed

16   his opposition, as well as a Motion to Amend.

17                                   **Background**

18          Plaintiff Arthur L. Johnson is confined in the Correctional Training Facility in

19   Soledad, California.

20          In his Third Amended Complaint, Plaintiff sued the following Defendants: Doctors

21   Ortiz, Salazar, Kushner, Castillo, Vilaysane, and Diep; Nurse Practioners Emler and

22   Doehring; and Registered Nurse Corona.  Plaintiff alleged that Defendant Corona was a

23   utilization management nurse "responsible for all [Utilization Management] Review

24   Processing for health care services for all prisoners at [Pleasant Valley State Prison-

25   Coalinga]."  Plaintiff alleged that the Court has federal question jurisdiction over his claim

26   under 42 U.S.C. § 1983 and invoked the Court's supplemental jurisdiction over his state

27   court claims of negligence/malpractice and failure to discharge a mandatory duty.

28

1   Plaintiff made the following allegations:

2   1.   On January 13, 2005, Plaintiff, after complaining about rapid
3        heartbeat and weight loss, was seen by Defendant Ortiz.
         Defendant Ortiz ordered a blood test.

4   2.   On February 1, 2005, Defendant Ortiz informed Plaintiff that
         the blood test showed a positive result for hypothyroidism,
5        prescribed a thyroid medication, and scheduled a follow-up
         appointment in a month.  On February 25th, Defendant Ortiz
6        examined Plaintiff, who had twice complained about increased
         heart palpitations and other symptoms, and informed Plaintiff
7        that he would be scheduled to see an "expert" who would
         perform a thyroid scan.
8
    3.   On April 26, 2005, Plaintiff was taken to a hospital to see an
9        endocrinologist, but the endocrinologist was unable to conduct
         the thyroid scan because prison medical staff had not informed
10       Plaintiff that he needed to stop his thyroid medication before the
         scan.    The endocrinologist advised medical staff to stop
11       Plaintiff's medication for six weeks.

12  4.   On June 13, 2005, Plaintiff was told that he would be getting a
         thyroid scan.  On June 15th, Plaintiff informed a nurse that he
13       was experiencing severe heart palpitations, constant shortness
         of breath, and fatigue.   The nurse told Plaintiff that his
14       complaints would be reported to Defendant Ortiz.  The nurse
         also informed Plaintiff that the thyroid scan appointment had
15       been cancelled by Defendant Corona.  On June 17th, Plaintiff
         received "lab work" and was informed that he would be started
16       back on this thyroid medication. On July 5th, Plaintiff was seen
         by Defendant Ortiz, who informed Plaintiff that the results of
17       the June 17th lab work were not in Plaintiff's file.  Defendant
         Ortiz told Plaintiff to "try and relax."
18
    5.   On August 11, 2005, Plaintiff received a thyroid scan.   On
19       September 8th, Plaintiff complained of severe heart palpitations,
         was evaluated by a nurse, was informed that he potentially had
20       cardiac arrhythmia, and was returned to his cell. On September
         9th, Defendant Ortiz saw Plaintiff, informed Plaintiff that he
21       needed to have his thyroid medication restarted, and stated that
         he would review the results of the thyroid scan and would see
22       Plaintiff "soon."

23  6.   On September 16, 2005, Defendant Salazar saw Plaintiff.
         Plaintiff informed Defendant Salazar of his health problems, but
24       Defendant Salazar made no diagnosis and simply told Plaintiff
         to take care of himself.   On October 12th, Plaintiff was
25       supposed to meet with Defendant Salazar to review the thyroid
         scan report, but the report had been misplaced, and Plaintiff's
26       appointment was rescheduled.

27  7.   On December 12, 2005, Defendant Kushner reviewed the
         thyroid scan report with Plaintiff and informed Plaintiff that he
28       needed Ablation therapy (Ablation) and that his heart

1

palpitations and arrhythmia were caused by Plaintiff's hyperthyroidism.

2

3

4

5

8.     On February 16, 2006, Defendant Emler informed Plaintiff that his thyroid was abnormally large, his uptake was abnormal, and his palpitations were due to cardiac problems. Defendant Emler informed Plaintiff that he would see an endocrinologist as soon as possible and requested a thyroid uptake test for the following week.

6

7

8

9.     On March 3, 2006, an endocrinologist saw Plaintiff, informed Plaintiff that he needed immediate Ablation, and told Plaintiff that prison staff would have to "schedule the correct process so that Plaintiff could obtain the medication and correct treatment and follow up."

9

10

11

12

10.    On March 16, 2006, Defendant Castillo met with Plaintiff. Plaintiff informed Defendant Castillo of his symptoms and informed Defendant Castillo that the endocrinologist had recommended Ablation.    Defendant Castillo discontinued Plaintiff's thyroid medication and prescribed a different medication.  He did not start Ablation.

13

14

11.    On April 12, 2006, Defendant Castillo informed Plaintiff that Defendant Castillo was requesting a blood test and that Plaintiff would soon be receiving Ablation.   The blood test was performed on May 2nd.

15

16

17

18

12.    On June 1, 2006, Defendant Castillo saw Plaintiff, told him that he would be given Ablation very soon based on the result of the blood test, and advised Plaintiff to stop taking his medication so another test could be performed.  A blood test was performed on July 5th and a thyroid stimulation hormone test (TSH) was performed on July 17th.

19

20

13.    On August 3, 2006, Plaintiff saw Defendant Emler to discuss Ablation treatment.  On August 16th, Plaintiff saw Defendant Castillo, complained about his symptoms, and pleaded to start receiving Ablation.

21

22

23

24

14.    On August 24, 2006, Defendant Vilaysane saw Plaintiff, placed Plaintiff back on medication, and ordered another TSH test. On September 14th, Plaintiff went to the medical department because his heart was racing, his vision was blurry, and he was dizzy.  A nurse informed him that he would soon be given Ablation.

25

26

27

15.    On September 20, 2006, the endocrinologist saw Plaintiff, explained that Plaintiff needed to be started on Ablation, and stated that repeated consultations were unnecessary because hyperthyroidism had already been diagnosed.  Plaintiff was placed back on medication.

28

16.    On September 26, 2006, Plaintiff saw Defendant Vilaysane to discuss scheduling Plaintiff for Ablation.  On October 25th, Defendant Vilaysane informed Plaintiff that he would be seen

1

2

3

4

5

by an endocrinologist soon for a followup. On November 15th, Defendant Vilaysane told Plaintiff that he needed another TSH test and a cardiac exam.   On December 6th, Defendant Vilaysane explained that the TSH test results were high and that Plaintiff was at risk for a heart attack.  Plaintiff explained that the endocrinologist had stated in September that Plaintiff should have been started on Ablation as soon as possible.  Defendant Vilaysane ordered more blood tests.

6

7

17.   On February 2, 2007, Defendant Vilaysane examined Plaintiff, told Plaintiff that he was scheduled to see an endocrinologist, and that he was suffering from anemia.  Defendant Vilaysane ordered more blood tests.

8

9

10

11

18.   On February 14, 2007, Plaintiff saw the endocrinologist, who stated that he was very disappointed that prison medical staff had not given Plaintiff Ablation and stressed that it was extremely important for Plaintiff to have the treatment.  The endocrinologist recommended that Plaintiff at least restart the thyroid medication.

12

13

19.   On March 16, 2007, Defendant Vilaysane saw Plaintiff and told Plaintiff that he would see the endocrinologist again soon. Defendant Vilaysane discontinued Plaintiff's thyroid medication after Plaintiff complained of hot and cold flashes.

14

15

16

20.   On March 25, 2007, after complaining of constipation, confusion, and pain, Plaintiff was seen by Defendant Diep, who opined that the constipation was caused by Plaintiff's hyperthyroidism and submitted a request for Plaintiff to see an endocrinologist.

. . . .

17

. . . .

18

19

20

21.   On April 12, 2007, Plaintiff saw Defendant Doehring, who reviewed Plaintiff's medical file and determined that he needed Ablation, ordered Plaintiff's test results, and prescribed a medication for Plaintiff's heart palpitations.

21

22

23

24

25

22.   On July 22, 2007, Plaintiff was having heart palpitations, was diagnosed with coronary ischemic arrhythmia, and received nitroglycerine while en route to a medical center.   At the medical center, the doctor explained that Plaintiff was suffering from Bradycardia "as a result of the hyperthyroid condition that he had been left in for years."  The doctor stated that Plaintiff should receive Ablation as soon as possible, the thyroid medication should be discontinued, and the heart palpitation medication probably caused damage to Plaintiff's heart.

26

27

28

23.   On July 31, 2007, Plaintiff saw Defendant Doehring and explained that his symptoms were ongoing and that he had repeatedly requested and been prescribed Ablation. Defendant Doehring stated that she was doing all she could.

1
2
3

24.    On September 27, 2007, Plaintiff was seen at a radiology medical group and was given a thyroid uptake scan.  It was again concluded that Plaintiff should receive Ablation as soon as possible.

4

25.    On October 3, 2007, Defendant Doering stated that Plaintiff would be getting Ablation.

5
6

26.    On November 8, 2007, twenty-three months after Defendant Kushner first informed Plaintiff that he needed Ablation, Plaintiff received Ablation.

7
8
9
10
11

Plaintiff also alleged that the California Department of Corrections and Rehabilitation (CDCR) "has a policy where a Doctor will personally diagnose a patient, prescribe medication and treatment, and a CDCR committee will override the diagnosis and recommendation for medication and do so without any input or communication with an inmate or the doctor that originally set forth a plan of treatment."

12
13
14
15
16
17
18

Plaintiff contended that the following "cumulated into a series of incidents amounting into countless delays, denials and intentional interferences of Plaintiff's access to qualified medical personnel constituting deliberate indifference to Plaintiff's serious medical condition": (1) the actions of Defendants Ortiz and Corona from April 26, 2005 through September 9, 2005; (2) the actions of Defendants Kushner, Salazar, Emler, and Castillo from September 16, 2005 through August 16, 2006; and (3) the actions of Defendants Vilaysane, Diep, and Doehring from August 24, 2006 through November 8, 2007.

19
20
21
22
23
24

Plaintiff asserted that Defendants Ortiz, Corona, Kushner, Salazar, Emler, Castillo, Vilaysane, Diep, and Doehring (1) "failed to discharge their mandatory duty pursuant to California Government Code § 815.6, which is [to not] inflict any treatment or allow any lack of care, . . . which would injure or impair the health of any prisoner in their custody"; and (2) were negligent under California law because they "failed to use such skill, prudence and diligence as other members of the medical profession commonly possess and exercise."

25
26
27
28

This Court issued a service order allowing Plaintiff to proceed on an Eighth Amendment claim against Defendant Corona  and on state law claims under California Government Code § 815.6 and for negligence/malpractice against Defendants Ortiz, Corona, Kushner, Salazar, Emler, Castillo, Vilaysane, Diep, and Doehring.

1                                    **DISCUSSION**

2          Defendants argue, as follows:

3          Plaintiff failed to plead and show proof of compliance with the California's
           Government Claims Act which requires that a claim against a state employee
4          be presented to the Victim Compensation and Government Claims Board no
           more than six months after the cause of action accrues. Cal. Gov't Code
5          §§900.2, 905, 905.2, 910, 911.2, 945.4, 950-950.2. Presentation of a timely
           claim is a prerequisite to maintaining a cause of action against a public entity.
6          *Creighton v. City of Livingston*, 628 F. Supp. 2d 1199, 1224-1225 (E.D. Cal.
           2009). To state a tort claim against a public employee, a plaintiff must allege
7          compliance with the Government Claims Act. *State v. Superior Court of Kings
           County (Bodde)* (2004) 32 Cal. 4th 1234, 1245. In general, no suit for money
8          or damages may be maintained against a government entity unless a formal
           claim has been presented to such entity and rejected, or said claim is deemed
9          rejected by the passage of time. Gov. Code §§945.4, 945.6. Suits against
           public employees for actions taken in the course and scope of their
10         employment are also subject to the requirements of the claims statute. Gov.
           Code §950.2. An employee is within the scope of his employment under the
11         claims act when he is engaged in the work he is employed to perform or when
           his act is incident to his duty and was performed for the benefit of his
12         employer and not merely to serve his own agenda. *Fowler v. Howell* (1996) 42
           Cal.App.4th 1746, 1750-1751. The scope of employment is viewed broadly to
13         include willful and malicious acts, as well as negligent acts. *id*. at 1751.
           Failure to comply with the claims statute bars the claim against the public
14         entity or public employee. *State of California v. Superior Court (Brodde)*
           (2004) 32 Cal.4th 1234, 1239. Where compliance with the Claims Act is
15         required, the plaintiff must allege compliance or circumstances excusing
           compliance. *Mangold v. California Pub. Utils. Comm'n*, 67 F.3d 1470, 1477
16         (9th Cir. Cal. 1995). The plaintiff has the burden of pleading and proving
           compliance with the California Government Claims Act. The filing of a timely
17         claim is an essential element of a cause of action against a public entity or
           employee. California Government Code §§950.2, 911.2(a); *Wood v. Riverside
18         General Hospital* (1994) 25 Cal.App.4th, 1113, 1119 (emphasis added).

19         Although Plaintiff asserts that he has exhausted his administrative remedies,
           he did not plead or prove his compliance with the Government Claims Act.
20         The Third Amended Complaint is devoid of any mention of the Act, let alone
           compliance with it and no exhibits, demonstrating compliance, are attached to
21         the complaint.[1]

22   (Defendants' Reply. at 3-4.)  Plaintiff's failure to comply with the Government Claims Act

23   bars his state law claims against the Defendants.

24         In response, Plaintiff claims that he properly filed a claim alleging negligence on

25   December 13, 2007.  Defendants, as well as the Court, will take this representation as true.

26   Based on Plaintiff's recitation of the facts, this results in all state claims arising before June

27

28
           [1]Defendants' Request for Judicial Notice is granted.

                                            - 6 -

1   13, 2007 being barred. Consequently, all state claims against Defendant Ortiz which

2   occurred from April 26 through September 9, 2005 are barred.  All state claims against

3   Defendant Corona which occurred from April 26 through September 2005 are barred.  In

4   addition, the state claims against Defendants Kushner, Salazar, Emler and Castillo, similarly

5   situated, are barred.  All state claims that arose against Defendants Doehring, Diep, and

6   Vilaysane  before June 13, 2007 are equally barred.

7       Defendants have no objection to allowing Plaintiff leave to amend the Third Amended

8   Complaint  to allege compliance with the Claims Act as to Defendant Doehring.  The Court

9   will not order an amendment, but will require the  Plaintiff to file an Offer of Proof as to any

10  notice of claim filed with reference Defendants Doehring. Diep and Vilaysane.

11      Accordingly,

12      IT IS ORDERED that Defendants' Motion to Dismiss the state law claims against

13  Defendants   Corona, Ortiz, Kushner, Salazar, Emler and Castillo (Doc. No. 28) is

14  GRANTED and  Defendants Ortiz, Kushner, Salazar, Emler and Castillo are dismissed from

15  this action with prejudice.  Defendant Corona remains a Defendant as to the claim of

16  deliberate indifference to serious medical needs.

17      IT IS FURTHER ORDERED that Defendants' Motion to Dismiss the state law claims

18  against Defendant Doehring is GRANTED on all claims based on acts occurring before June

19  13, 2007.

20       IT IS FURTHER ORDERED that Plaintiff's Motion for Leave to Amend is

21  DENIED.  Plaintiff should file an Offer of Proof (brief and supporting documents as

22  attachments) on or before **July 23, 2010** with the Court as to any notice of claim filed with

23  reference to state claims against Defendants Doehring, Diep and Vilaysane.

24      DATED this 24th day of June, 2010.

25

26

27                                           David C. Bury
                                        United States District Judge
28