1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

Arthur L. Johnson,          )    No. CV 1-08-1183-DCB P
                           )
       Plaintiff,      )    **ORDER**
                           )
vs.                  )
                           )
Dr. Ortiz, et al.,      )
                           )
       Defendants.   )

Defendants' Motions for Summary Judgment are before the Court.

## BACKGROUND

Plaintiff Arthur L. Johnson is confined in the Correctional Training Facility in Soledad, California. Plaintiff's original complaint was filed on August 13, 2008.  He amended that complaint on August 25, 2008, and on January 25, 2010 (Doc. 20).  On June 25, 2010, his fourth motion to amend was denied.  (Doc. 35.)  Defendants filed an Answer on September 24, 2010 (Doc. 49) and the Court entered a scheduling order.  On April 1, 2011,   Defendant Doehring filed a motion for summary judgment.  (Doc. 58.)  The Court issued the *Rand* warning on April 8, 2011.  Defendants Doehring and Corona filed a joint motion for summary judgment on April 29, 2011.  (Doc. 62.)  The Court again issued a *Rand* warning on May 24, 2011.

In his Third Amended Complaint, Plaintiff sued the following Defendants: Doctors Ortiz, Salazar, Kushner, Castillo, Vilaysane, and Diep; Nurse Practicioners Emler and

Doehring; and Registered Nurse Corona.  Plaintiff alleged that Defendant Corona was a utilization management nurse "responsible for all [Utilization Management] Review Processing for health care services for all prisoners at [Pleasant Valley State Prison-Coalinga]."  Plaintiff alleged that the Court has federal question jurisdiction over his claim under 42 U.S.C. § 1983 and invoked the Court's supplemental jurisdiction over his state court claims of negligence/malpractice and failure to discharge a mandatory duty.

Originally, Plaintiff made the following allegations:

1. On January 13, 2005, Plaintiff, after complaining about rapid heartbeat and weight loss, was seen by Defendant Ortiz. Defendant Ortiz ordered a blood test.

2. On February 1, 2005, Defendant Ortiz informed Plaintiff that the blood test showed a positive result for hypothyroidism, prescribed a thyroid medication, and scheduled a follow-up appointment in a month.  On February 25th, Defendant Ortiz examined Plaintiff, who had twice complained about increased heart palpitations and other symptoms, and informed Plaintiff that he would be scheduled to see an "expert" who would perform a thyroid scan.

3. On April 26, 2005, Plaintiff was taken to a hospital to see an endocrinologist, but the endocrinologist was unable to conduct the thyroid scan because prison medical staff had not informed Plaintiff that he needed to stop his thyroid medication before the scan.  The endocrinologist advised medical staff to stop Plaintiff's medication for six weeks.

4. On June 13, 2005, Plaintiff was told that he would be getting a thyroid scan.  On June 15th, Plaintiff informed a nurse that he was experiencing severe heart palpitations, constant shortness of breath, and fatigue.  The nurse told Plaintiff that his complaints would be reported to Defendant Ortiz.  The nurse also informed Plaintiff that the thyroid scan appointment had been cancelled by Defendant Corona.  On June 17th, Plaintiff received "lab work" and was informed that he would be started back on this thyroid medication.  On July 5th, Plaintiff was seen by Defendant Ortiz, who informed Plaintiff that the results of the June 17th lab work were not in Plaintiff's file.  Defendant Ortiz told Plaintiff to "try and relax."

5. On August 11, 2005, Plaintiff received a thyroid scan.  On September 8th, Plaintiff complained of severe heart palpitations, was evaluated by a nurse, was informed that he potentially had cardiac arrhythmia, and was returned to his cell.  On September 9th, Defendant Ortiz saw Plaintiff, informed Plaintiff that he needed to have his thyroid medication restarted, and stated that he would review the results of the thyroid scan and would see Plaintiff "soon."

6.      On September 16, 2005, Defendant Salazar saw Plaintiff. Plaintiff informed Defendant Salazar of his health problems, but Defendant Salazar made no diagnosis and simply told Plaintiff to take care of himself.   On October 12th, Plaintiff was supposed to meet with Defendant Salazar to review the thyroid scan report, but the report had been misplaced, and Plaintiff's appointment was rescheduled.

7.      On December 12, 2005, Defendant Kushner reviewed the thyroid scan report with Plaintiff and informed Plaintiff that he needed Ablation therapy (Ablation) and that his heart palpitations and arrhythmia were caused by Plaintiff's hyperthyroidism.

8.      On February 16, 2006, Defendant Emler informed Plaintiff that his thyroid was abnormally large, his uptake was abnormal, and his palpitations were due to cardiac problems.  Defendant Emler informed Plaintiff that he would see an endocrinologist as soon as possible and requested a thyroid uptake test for the following week.

9.      On March 3, 2006, an endocrinologist saw Plaintiff, informed Plaintiff that he needed immediate Ablation, and told Plaintiff that prison staff would have to "schedule the correct process so that Plaintiff could obtain the medication and correct treatment and follow up."

10.     On March 16, 2006, Defendant Castillo met with Plaintiff. Plaintiff informed Defendant Castillo of his symptoms and informed Defendant Castillo that the endocrinologist had recommended Ablation.   Defendant Castillo discontinued Plaintiff's thyroid medication and prescribed a different medication.  He did not start Ablation.

11.     On April 12, 2006, Defendant Castillo informed Plaintiff that Defendant Castillo was requesting a blood test and that Plaintiff would soon be receiving Ablation.   The blood test was performed on May 2nd.

12.     On June 1, 2006, Defendant Castillo saw Plaintiff, told him that he would be given Ablation very soon based on the result of the blood test, and advised Plaintiff to stop taking his medication so another test could be performed.  A blood test was performed on July 5th and a thyroid stimulation hormone test (TSH) was performed on July 17th.

13.     On August 3, 2006, Plaintiff saw Defendant Emler to discuss Ablation treatment.  On August 16th, Plaintiff saw Defendant Castillo, complained about his symptoms, and pleaded to start receiving Ablation.

14.     On August 24, 2006, Defendant Vilaysane saw Plaintiff, placed Plaintiff back on medication, and ordered another TSH test.  On September 14th, Plaintiff went to the medical department because his heart was racing, his vision was blurry, and he was

dizzy.  A nurse informed him that he would soon be given Ablation.

15. On September 20, 2006, the endocrinologist saw Plaintiff, explained that Plaintiff needed to be started on Ablation, and stated that repeated consultations were unnecessary because hyperthyroidism had already been diagnosed.  Plaintiff was placed back on medication.

16. On September 26, 2006, Plaintiff saw Defendant Vilaysane to discuss scheduling Plaintiff for Ablation.  On October 25th, Defendant Vilaysane informed Plaintiff that he would be seen by an endocrinologist soon for a followup.  On November 15th, Defendant Vilaysane told Plaintiff that he needed another TSH test and a cardiac exam.   On December 6th, Defendant Vilaysane explained that the TSH test results were high and that Plaintiff was at risk for a heart attack.  Plaintiff explained that the endocrinologist had stated in September that Plaintiff should have been started on Ablation as soon as possible.  Defendant Vilaysane ordered more blood tests.

17. On February 2, 2007, Defendant Vilaysane examined Plaintiff, told Plaintiff that he was scheduled to see an endocrinologist, and that he was suffering from anemia.  Defendant Vilaysane ordered more blood tests.

18. On February 14, 2007, Plaintiff saw the endocrinologist, who stated that he was very disappointed that prison medical staff had not given Plaintiff Ablation and stressed that it was extremely important for Plaintiff to have the treatment.  The endocrinologist recommended that Plaintiff at least restart the thyroid medication.

19. On March 16, 2007, Defendant Vilaysane saw Plaintiff and told Plaintiff that he would see the endocrinologist again soon.  Defendant Vilaysane discontinued Plaintiff's thyroid medication after Plaintiff complained of hot and cold flashes.

20. On March 25, 2007, after complaining of constipation, confusion, and pain, Plaintiff was seen by Defendant Diep, who opined that the constipation was caused by Plaintiff's hyperthyroidism and submitted a request for Plaintiff to see an endocrinologist..

21. On April 12, 2007, Plaintiff saw Defendant Doehring, who reviewed Plaintiff's medical file and determined that he needed Ablation, ordered Plaintiff's test results, and prescribed a medication for Plaintiff's heart palpitations.

22. On July 22, 2007, Plaintiff was having heart palpitations, was diagnosed with coronary ischemic arrhythmia, and received nitroglycerine while en route to a medical center.  At the medical center, the doctor explained that Plaintiff was suffering from Bradycardia "as a result of the hyperthyroid condition that he had been left in for years."  The doctor stated that Plaintiff should receive Ablation as soon as possible, the thyroid

- 4 -

medication should be discontinued, and the heart palpitation medication probably caused damage to Plaintiff's heart.

23.   On July 31, 2007, Plaintiff saw Defendant Doehring and explained that his symptoms were ongoing and that he had repeatedly requested and been prescribed Ablation.  Defendant Doehring stated that she was doing all she could.

24.   On September 27, 2007, Plaintiff was seen at a radiology medical group and was given a thyroid uptake scan.  It was again concluded that Plaintiff should receive Ablation as soon as possible.

25.   On October 3, 2007, Defendant Doering stated that Plaintiff would be getting Ablation.

26.   On November 8, 2007, twenty-three months after Defendant Kushner first informed Plaintiff that he needed Ablation, Plaintiff received Ablation.

Plaintiff contended that the following "cumulated into a series of incidents amounting into countless delays, denials and intentional interferences of Plaintiff's access to qualified medical personnel constituting deliberate indifference to Plaintiff's serious medical condition": (1) the actions of Defendants Ortiz and Corona from April 26, 2005 through September 9, 2005; (2) the actions of Defendants Kushner, Salazar, Emler, and Castillo from September 16, 2005 through August 16, 2006; and (3) the actions of Defendants Vilaysane, Diep, and Doehring from August 24, 2006 through November 8, 2007.

Plaintiff asserted that Defendants Ortiz, Corona, Kushner, Salazar, Emler, Castillo, Vilaysane, Diep, and Doehring (1) "failed to discharge their mandatory duty pursuant to California Government Code § 815.6, which is [to not] inflict any treatment or allow any lack of care, . . . which would injure or impair the health of any prisoner in their custody"; and (2) were negligent under California law because they "failed to use such skill, prudence and diligence as other members of the medical profession commonly possess and exercise."

This Court issued a service order allowing Plaintiff to proceed on an Eighth Amendment claim against Defendant Corona  and on state law claims under California Government Code § 815.6 and for negligence/malpractice against Defendants Ortiz, Corona, Kushner, Salazar, Emler, Castillo, Vilaysane, Diep, and Doehring.

- 5 -

1    Plaintiff claimed that he properly filed a claim alleging negligence on December 13,

2    2007.  Defendants, as well as the Court, took  this representation as true.  Based on

3    Plaintiff's recitation of the facts, all state claims arising before June 13, 2007 were deemed

4    barred by this Court. Consequently, all state claims against Defendant Ortiz which occurred

5    from April 26 through September 9, 2005 were  barred.  All state claims against Defendant

6    Corona which occurred from April 26 through September 2005 were  barred.  In addition,

7    the state claims against Defendants Kushner, Salazar, Emler and Castillo, similarly situated,

8    were barred.  All state claims that arose against Defendants Doehring, Diep, and Vilaysane

9    before June 13, 2007 were equally barred.

10    Defendants' Motion to Dismiss the state law claims against Defendants  Corona,

11    Ortiz, Kushner, Salazar, Emler and Castillo was granted and  Defendants Ortiz, Kushner,

12    Salazar, Emler and Castillo were dismissed from this action with prejudice.  Corona and

13    Doehring remained  Defendants as to the claim of deliberate indifference to serious medical

14    needs.  Finally, Defendants' Motion to Dismiss the state law claims against Defendant

15    Doehring was granted on all claims based on acts occurring before June 13, 2007.

16    Before the Court is Doehring's motion for summary judgment on the negligence claim

17    under California law after June 13, 2007 and  Doehring's and Corona's joint motion for

18    summary judgment on the deliberate indifference to serious medical needs claim.[1]  (Docs.

19    58, 62.)

20                    **STANDARD OF REVIEW**

21    The purpose of summary judgment is to avoid unnecessary trials when there is no

22    dispute as to the facts before the court. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d

23    1468, 1471 (9th Cir. 1994). Summary judgment is proper when "the movant shows that there

24    is no genuine dispute as to any material fact and the movant is entitled to a judgment as a

25

26    —————————————

27    [1]Before the Court is Plaintiff's fifth motion to file an amended complaint (Doc. 73),
lodged three months after the pending dispositive motions were filed, which will be treated
28    as a motion to supplement to Plaintiff's opposition to both dispositive motions, and granted
as such.  (Doc. 73.)

matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmovant, and a dispute is "material" only if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986); *Matsushita Elec. Ind. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). The movant has the burden of showing the absence of a genuine dispute, and the court must view all facts and draw all inferences in the light most favorable to the nonmovant. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982), *cert. denied*, 460 U.S. 1085 (1983).

Once the movant satisfies the requirements of Rule 56, the burden shifts to the nonmovant to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The non-moving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosp., Inc.*, 929 F.2d 1404 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252.

## DISCUSSION

**A. Negligent Actions by Doehring After June 13, 2007**

Plaintiff claimed that Defendant Doehring prescribed wrong medication to him in April 2007.  Plaintiff claims that on April 12, 2007, Doehring prescribed Atenolol for his heart palpitations. Plaintiff alleges that he was told that the Atenolol probably caused him heart damage, and that it should not have been prescribed. He alleges that the injuries he suffered as a result of Doehring's actions were due to the medication that she prescribed. In fact, the record reflects that  Doehring did not prescribe any medication after April 12, 2007.

Under California law, to prevail on a medical malpractice claim, a plaintiff must establish that: (1) defendant owed a duty "to use such skill, prudence, and diligence as other

1   members of the profession commonly possess and exercise"; (2) defendant breached that

2   duty; (3) the breach was a proximate cause of injury to the plaintiff; and (4) plaintiff suffered

3   resulting loss or damage. *Johnson v. Superior Court,* 143 Cal.App.4th 297, 305 (2006).  An

4   essential element is that there be some reasonable connection between the act or omission

5   of the defendant and the damage which the plaintiff has suffered. This element is known as

6   "proximate cause. " *Frantz v. San Luis Medical Clinic,* 81 Cal. App. 3d 34, 39  (1978). The

7   plaintiff has the burden of pleading and proving the separate elements. *Hoyem v. Manhattan*

8   *Beach City Sch. Dist.,*  22 Cal.3d 508, 513-514 (1978).

9        In the absence of an express agreement regarding the outcome of treatment, a

10   physician is not required to guarantee specific results or a cure. *Custodio v. Bauer*, 251 Cal.

11   App. 2d 303, 312 (1967) .   Therefore, an error of judgment in choosing among various

12   approved methods of diagnosis or treatment does not give rise to liability for negligence as

13   long as reasonable care was exercised in making the selection. *Barton v. Owen,* 71 Cal. App.

14   3d 484, 502 (1977).

15        A practitioner is not to be held responsible merely because her treatment of a patient

16   was not successful or was accompanied by untoward consequences.  The practitioner is not

17   omniscient or capable invariably of knowing that her professional acts will achieve the

18   desired result; she is responsible only where it is established that she did not act with the

19   knowledge or foresight of practitioners generally or as a reasonably skillful and experienced

20   practitioner would have acted in the same circumstances. The practitioner is required to use

21   her best judgment in exercising her skill and applying her knowledge, but mere errors in

22   judgment are not ground for liability unless the skill and judgment actually employed fall

23   below the standard.  *Allen v. Leonard*,  270 Cal. App. 2d 209, 215 (1969).

24        Taking the evidence in a light most favorable to the Plaintiff, his claims against

25   Defendant Doehring are based on pure on speculation. (Doc. 58-4 page 15.)   Plaintiff's

26   response (Doc. 68) does little to help his case and frankly, highlights the speculative nature

27   of his claims against Doehring.  The reply (Doc. 72) explains clearly that Plaintiff has failed

28   to present evidence supporting a negligence claim against Doehring at all.  Further, at this

1   late date, Plaintiff may not interject that the basis of the action for negligence as Doehring's

2   failure to examine him by means of an EKG sometime after June 13, 2007, although the

3   allegations overall taken as a whole do not meet the test for negligence.

4        There is no material question of fact precluding a conclusion that Doehring's actions

5   did not breach a duty of care owed to Plaintiff.   She could only be found liable for negligent

6   actions that occurred after June 13, 2007, as previously ruled by the Court . In fact, Plaintiff

7   makes no allegations involving any acts by Defendant Doehring after June 13, 2007 that

8   resulted in injury. (Doc. 58-4, Ex. C at 14-16.)

9        There is no evidence that Defendant Doehring breached a duty of care to Plaintiff.

10  The motion for summary judgment (Doc. 58) will be granted in favor of Defendant Doehring

11  on the claim of negligence under California law.

12  **B. Deliberate Indifference to Serious Medical Needs by Corona and Doehring**

13       Both remaining Defendants have filed a joint motion for summary judgment (Doc. 62)

14  with reference to Plaintiff's core claim of indifference to his serious medical needs. The

15  Court will treat Plaintiff's fifth motion to file an amended complaint, memorandum and

16  request for judicial notice  as a supplement to his response in opposition to this jointly filed

17  motion.

18       Not every claim by a prisoner that he has received inadequate medical treatment states

19  a violation of the Eighth Amendment.  To state a § 1983 medical claim, a plaintiff must show

20  that the defendants acted with "deliberate indifference to serious medical needs." *Jett v.*

21  *Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104

22  (1976)).   A plaintiff must show (1) a "serious medical need" by demonstrating that failure

23  to treat the condition could result in further significant injury or the unnecessary and wanton

24  infliction of pain and (2) the defendant's response was deliberately indifferent.  *Jett*, 439

25  F.3d at 1096 (quotations omitted).

26       To act with deliberate indifference, a prison official must both know of and disregard

27  an excessive risk to inmate health; the official must both be aware of facts from which the

28  inference could be drawn that a substantial risk of serious harm exists and he must also draw

the inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference in the medical context may be shown by a purposeful act or failure to respond to a prisoner's pain or possible medical need and harm caused by the indifference. *Jett,* 439 F.3d at 1096. Deliberate indifference may also be shown when a prison official intentionally denies, delays, or interferes with medical treatment or by the way prison doctors respond to the prisoner's medical needs. *Estelle*, 429 U.S. at 104-05; *Jett*, 439 F.3d at 1096.

"Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Farmer*, 511 U.S. at 835. Medical malpractice or negligence is insufficient to establish an Eighth Amendment violation. *Toguchi*, 391 F.3d at 1060. Thus, mere negligence in diagnosing or treating a condition does not violate the Eighth Amendment. *Id.* at 1057. A mere difference of medical opinion between a prisoner and the defendant is insufficient to establish deliberate indifference. *Toguchi*, 391 F.3d at 1058. Also, an inadvertent failure to provide adequate medical care alone does not rise to the Eighth Amendment level. *Jett,* 429 F.3d at 1096. A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). The indifference must be substantial. The action must rise to a level of "unnecessary and wanton infliction of pain." *Estelle,* 429 U.S. at 105-06.

### 1. Defendant Corona

The record before the Court, including medical records, inmate grievance reports, and deposition testimony/affidavits, supports the undisputed facts (UF) as they go to the involvement of Defendant Corona, as follows:

> CORONA is a registered nurse in the State of California. (UF No. 1) He has been employed as a nurse with the California Department of Corrections and Rehabilitation (CDCR) at Pleasant Valley State Prison (PVSP) since 2003. (UF No. 2) In 2005, CORONA worked as a Utilization Management Nurse at PVSP. (UF No. 3) JOHNSON claims that he was told by RN Herrera that his scheduled appointment for a thyroid scan was

1   cancelled by CORONA on June 15, 2005. (UF No. 4) The Utilization
2   Management (UM) Program at PVSP is designed to assure that medically
3   necessary health care services are provided to inmates. (UF No. 5) If an
    inmate's physician determines that an inmate requires a medical service
4   which cannot be performed at the prison, the physician will submit a
5   Request for Services form (RFSto the UM office. (UF No. 6) In 2005, if the
    requested service was deemed medically necessary as defined in C.C.R,
6   Title 15, §§3350, et seq, the information in the RFS was placed into the
7   prison's computerized tracking system. (UF No. 7) The UM schedulers
8   would use the information to acquire contracts with outside providers and
    schedule the requested service. (UF No. 8) If the requested service was not
9   considered medically
10  necessary, the RFS was reviewed by PVSP's Chief Medical Officer to
11  determine whether the treatment would be provided based on specific
    criteria provided by CDCR. (UF No. 9) If the Chief Medical Officer was
12  unable to approve the treatment, then the ultimate determination was made
13  by the Medical Authorization Review (MAR) Committee. (UF No. 10)
14  As a Utilization Management Nurse, CORONA did not examine inmates,
    make diagnoses, or provide recommendations for treatment. (UF No. 11)
15  CORONA'S duty was to process Request for Services forms. (UF No. 12)
16  Upon receipt of a RFS, he would review the request to determine if the
17  requested treatment was considered medically necessary as defined in
    C.C.R, Title 15,§§3350, et seq. (UF No. 13) If the treatment was medically
18  necessary, CORONA would enter the information contained in the RFS
19  into the prison's computerized tracking system. (UF No. 14) If the
    treatment
20  was not deemed medically necessary, CORONA would take the RFS to the
21  Chief Medical Officer who would make a determination of whether the
22  treatment would be provided for the inmate. (UF No. 15) If the Chief
    Medical Officer or MAR Committee informed CORONA that the service
23  would be provided, he would enter the request into the computerized
24  tracking system. (UF No. 16) The UM schedulers would then schedule the
25  appointment for the requested service. (UF No. 17) UM Schedulers were
26  responsible for obtaining outside specialty care appointments. (UF No. 18)
    CORONA did not schedule appointments for inmates. (UF No. 19)
27  Additionally, CORONA did not have the authority to approve services nor
28  could he cancel scheduled appointments for inmates. (UF No. 20)

1
2
3
4
5
6
7
8

      CORONA did not cancelany of inmate JOHNSON'S scheduled thyroid
scans. (UF No. 21) It was not CORONA'S duty to inform inmates, or their
health care providers, of the status of their appointments or to prepare them
for their scheduled appointments. (UF No. 22) UM Schedulers were
responsible for informing inmate's physicians about the status of an
appointment and of any pre-procedure instructions. (UF No. 23) It was not
CORONA'S duty to obtain transportation for inmates to their outside
appointments for medical treatment. (UF No. 24) CORONA is not nor has
he ever been a member of the MAR Committee. (UF No. 25) CORONA has
never met or treated JOHNSON. (UF No. 26)

9 (Doc. 62-1 at 5-7.)

10       Defendant Corona is a registered nurse.  Plaintiff believes that he cancelled Plaintiff's

11 appointment for a thyroid scan on June 15, 2005.  Corona did not make decisions about

12 services or treatment but entered information into the system, based on what the chief

13 medical officer told him to do.  There is no evidence in the record that Corona ever met or

14 treated Plaintiff.  Plaintiff contended that Defendant Corona cancelled his June 2005 thyroid

15 scan appointment and is "responsible for all [Utilization Management] Review Processing

16 for health care services for all prisoners" at Pleasant Valley State Prison-Coalinga.

17       Defendant Corona is a not member of the committee that "override[s] the diagnosis

18 and recommendation for medication and do[es] so without any input or communication with

19 an inmate or the doctor that originally set forth a plan of treatment."  Defendant Corona did

20 as he was instructed to do and was not a decisionmaker.

21       The Court finds that this Defendant is entitled to summary judgment and dismissal

22 from this case because there is no evidence that he was deliberately indifferent to Plaintiff's

23 medical needs. While he was a UM nurse, he did not examine inmates, make diagnoses, or

24 provide recommendations for treatment. He only entered information contained in Request

25 for Services forms into the prison's computerized tracking system. The UM schedulers were

26 responsible for scheduling outside medical appointments for inmates. He did not schedule

27 appointments for inmates.  Additionally, he has never met or treated Plaintiff and could not

28 approve services for Plaintiff.  Further, he could not cancel scheduled appointments for

inmates. The record is unrefuted that he could or did make the decision to cancel Plaintiff's appointment for a thyroid scan.

There is no genuine issue as to any material fact which would preclude this action from resolution on a dispositive motion.  In sum, the claim of Eighth Amendment deliberate indifference to Plaintiff's serious medical needs against Defendant Corona is unsubstantiated.

## 2. Defendant Doehring

The Court finds the following undisputed facts (UF), based on medical records, inmate grievance reports, and deposition testimony/affidavits,  with reference to the actions of Defendant Doehring:

> DOEHRING is a registered nurse practitioner in the State of California. (UF No. 31) She has been employed as a registered nurse with the CDCR since February 1, 2007 and was a nurse at PVSP from February 2007 to November 2008. (UF No. 32) DOEHRING'S responsibilities while at PVSP included the medical treatment of inmates, one of whom was JOHNSON. (UF No. 33) DOEHRING treated JOHNSON for a variety of medical conditions, including hypertension (high blood pressure), hyperthyroidism (over active thyroid), and cardiac arrhythmias (irregular heartbeat) as a result of the hyperthyroidism. (UF No. 34) Beta blockers are medications that reduce blood pressure. (UF No. 35) Beta blockers work by blocking the effects of the hormone epinephrine, also known asadrenaline. (UF No. 36) When beta blockers are taken, the heart beats more slowly and with less force, thereby reducing blood pressure. (UF No. 37) Beta blockers also help blood vessels open up to improve blood flow. (UF No. 38) These drugs can be useful for the treatment of cardiac arrhythmias, particularly those involving abnormally fast heart rates or premature beats of the heart. (UF No. 39) Arrhythmia is an abnormality in the heart's rhythm or heartbeat pattern. (UF No. 40) The heartbeat can be too slow, too fast, have extra beats, skip a beat, or be otherwise irregular. (UF No. 41) Atenolol (Tenormin) is a commonly prescribed beta blocker. (UF No. 42) Atenolol helps to regulate heart rate or arrhythmia. (UF No. 43) This drug works by slowing down the heart and reducing its workload to improve blood flow and decrease blood pressure. (UF No. 44) Atenolol is commonly used to treat angina (chest pain of cardiac origin), hypertension

(high blood pressure), cardiac arrythmias with rapid heart rates and arrythmias related to hyperthyroidism. (UF No. 45) It is also used to treat or prevent heart attack. (UF No. 46) Graves' disease is the most common form of hyperthyroidism, occurring when the immune system mistakenly attacks the thyroid gland and causes it to overproduce the hormone thyroxine. (UF No. 47) For all types of hyperthyroidism, beta blockers are very helpful. Propranolol (Inderol), metoprolol (Lopressor) and atenolol (Tenormin) are commonly used members of this family of drugs. (UF No. 48) These drugs do not have any effect on the thyroid gland itself, but rapidly block the effects of the high hormone levels on the heart, nervous system and other organs. (UF No. 49) Therefore, beta blockers help control the heart racing, palpitations, shakes and some of the psychological problems that occur with hyperthyroidism. (UF No. 50) Prior to prescribing medication to a patient, DOEHRING reviews pertinent portions of the patient's medical file to determine all of the patient's symptoms, medical conditions, treatment, and past and current medications. (UF No. 51) She alsoconsults the current edition of the Physician's Desk Reference and/or the Tarascon Pocket Pharmacopoeia to ensure that the medication is appropriate for the patient. (UF No. 52) The Physician's Desk Reference is a drug information reference. (UF No. 53) It is a commercially published compilation of manufacturers' prescribing information on prescription drugs, updated annually. (UF No. 54) The Physician's Desk Reference is designed to provide physicians with the full legally mandated information relevant to writing prescriptions. (UF No. 55) The Tarascon Pocket Pharmacopoeia is also a trusted portable drug reference. (UF No. 56) On April 12, 2007, DOERHING prescribed atenolol to JOHNSON. (UF No. 57) Prior to prescribing JOHNSON atenolol, DOEHRING reviewed JOHSNON'S medical file and noted that he had a history of tachyarrhythmias from his hyperthyroidism. (UF No. 58) Tachyarrhythmia is a medical condition in which the heartbeat is fast and irregular. (UF No. 59) JOHNSON also had a history of complaining about heart palpitations and fatigue. (UF No. 60) He was also diagnosed with Graves Disease. (UF No. 61) Based on JOHNSON'S medical history, and her review of the drug references for 2007, DOEHRING considered atenolol an appropriate choice. (UF No. 62) Prior to the prescription of atenolol, JOHNSON had been prescribed other beta blockers, such as Propranolol (inderal), but JOHNSON complained of continued palpitations. (UF No. 63)  Atenolol was chosen over Propranolol

because of its longer half-life (duration 6-9 hours) versus the short half life of Propranolol (duration 3 to 4 hours), so the effects of atenolol would last longer. (UF No. 64) JOHNSON took atenolol from April 12, 2007 until July

2007. (UF No. 65) On July 23, 2007, JOHNSON was taken to Coalinga Regional Medical Center. (UF No. 66) He was admitted into the hospital due to dizziness and headache. (UF No. 67) When admitted, JOHNSON was diagnosed with bradycardia and hyperthyroidism. (UF No. 68) Bradycardia is an abnormally low heart rate of less than 60 beats per minute. (UF No. 69) The EKG taken on July 23, 2007 indicated that there were no acute ST-T wave changes, and JOHNSON'S cardiac enzymes were normal. (UF No. 70) An EKG is an electrocardiogram, which is used to monitor the heart and diagnose various heart conditions. (UF No. 71) The results from JOHNSON'S EKG established that there was no damage, either temporary or permanent, to JOHNSON'S heart. (UF No. 72) JOHNSON was discharged from the hospital on July 26, 2007. (UF No. 73) His diagnoses upon discharge were hypothyroidism, bradycardia, and chest pain. (UF No. 74) On July 31, 2007, DOEHRING discontinued JOHNSON'S prescription for atenolol because atenolol is contraindicated for patients with bradycardia. (UF No. 75) JOHNSON was not prescribed atenolol after he was discharged from the hospital. (UF No. 76) Based on a recommendation by an endocrinologist, a physician's request for

JOHNSON to receive radioactive I-131 ablation therapy to treat his hyperthyroidism was submitted on March 25, 2007. (UF No. 77) Radioactive Iodine I-131 therapy is used to treat an overactive thyroid (hyperthyroidism) by reversing the overactivity. (UF No. 78) On April 12, 2007, DOEHRING submitted an emergent order for JOHNSON to receive this treatment. (UF No. 79) On May 16, 2007, DOEHRING submitted another emergent order for JOHNSON to receive ablation treatment because, on the date of JOHNSON'S consultation, the treatment center's technician did not show up and the treatment was not performed. (UF No. 80) On July 31, 2007, DOEHRING submitted another order for JOHNSON to receive ablation therapy immediately. (UF No. 81) She also wrote an order for JOHNSON to be seen in two weeks for a follow up appointment. (UF No. 82) DOEHRING submitted two more requests for ablation therapy until JOHNSON was scheduled for treatment. (UF No. 83) JOHNSON

- 15 -

received ablation treatment on November 8, 2007. (UF No. 84)DOEHRING was JOHNSON'S advocate for ablation treatment. (UF No. 85) In the requests for services forms she submitted, DOEHRING would put as much information as she could, using the strongest language possible, in order to demonstrate JOHNSON'S need for treatment. (UF No. 86) DOEHRING can only submit requests for inmates to receive treatment from outside medical providers. (UF No. 87) The prison's UM schedulers are responsible for acquiring contracts with outside providers and scheduling the appointments. (UF No. 88) DOEHRING can only continue to submit referrals for service until the inmate is scheduled for treatment, which is primarily dependent on the availability of the outside provider. (UF No. 89)

(Doc. 62-1 at 7-11.)

Defendant Doehring is a registered nurse practitioner with responsibilities including medical treatment of inmates.  She did treat Plaintiff.  She treated him for hypertension, hyperthyroidism and cardiac arrhythmias, as well as hyperthyroidism.  She prescribed atenolol for Plaintiff beginning in April 2007 until July 2007.  In July 2007, Plaintiff was transmitted to the hospital for dizziness and headache.  He was diagnosed with bradycardia and hyperthyroidism.  He was given an EKG at that time. Doehring discontinued ablation therapy after he returned from the hospital because atenolol is contraindicated for patients with bradycardia, a condition he had not been diagnosed with previously.  In addition, an endocrinologist requested that Plaintiff receive radioactive 1-131 ablation therapy in March 25, 2007.  Plaintiff did not receive the treatment until November 8, 2007.  Doehring could only submit requests on Plaintiff's behalf but the actually scheduling of appointment was dependent on providers and availability of appointments.   At one point, Plaintiff acknowledged that Doehring was his advocate.

The Court finds no evidence that atenolol caused Plaintiff injury. Medical records from Coalinga Regional Medical Center indicate that Plaintiff was admitted to the hospital because of dizziness and headache. He was taking atenolol for over three months before he was admitted to the hospital. Nowhere is it mentioned in the records that Plaintiff was brought to the hospital because of the effects of atenolol. The EKG taken when he was

1    admitted to the hospital established that there was no damage to his heart. The prescription

2    for atenolol was discontinued once he was diagnosed with bradycardia, not because the

3    medication caused the injury.  Further, the evidence supports that Defendant Doehring could

4    only submit requests for inmates to receive treatment from outside medical providers. The

5    prison's UM schedulers are responsible for acquiring contracts with outside providers and

6    scheduling the appointments. She could only continue to submit referrals for service until the

7    inmate is scheduled for treatment, which is primarily dependent on the availability of the

8    outside provider. She continued to submit requests for the treatment until Plaintiff received

9    the ablation therapy.

10        Plaintiff has not satisfied the two-part test to demonstrate a deprivation of his Eighth

11   Amendment right. First, the alleged constitutional deprivation objectively must be

12   "sufficiently serious[.]" *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). That is, "a prison

13   official's act or omission must result in the denial of 'the minimal civilized measure of life's

14   necessities.'" *Farmer*, 511 U.S. at 834 (*quoting Rhodes v. Chapman*, 452 U.S. 337, 347

15   (1981)). In the medical-care context, "[a] serious medical need exists if the failure to treat

16   a prisoner's condition could result in further significant injury or the unnecessary and wanton

17   infliction of pain." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) (internal

18   citations and quotations omitted) *overruled on other grounds in WMX Technologies, Inc. v.*

19   *Miller*, 104 F.3d 1133 (9th Cir. 1997). Second, there must be evidence  that supports a

20   finding that the prison official acted with deliberate indifference in causing the deprivation.

21   *Toguchi*, 391 F.3d at 1057. That is, the prison official must "know[] of and disregard[] an

22   excessive risk to inmate health and safety." *Gibson v. County of Washoe, Nevada*, 290 F.3d

23   1175, 1187 (9th Cir. 2002). Under this subjective approach, the prison official "must both

24   be aware of facts from which the inference could be drawn that a substantial risk of serious

25   harm exists, and he [or she] must also draw the inference." *Farmer*, 511 U.S. at 837.

26   Doehring has no reason to believe that Plaintiff had a condition that contraindicated atenolol.

27        Here, the undisputed evidence supports a finding that Defendant Doehring did not

28   violate Plaintiff's constitutional rights.

1

## CONCLUSION

2      Based on the foregoing,

3      **IT IS ORDERED** that Plaintiff's Motion to Amend, treated as a motion to

4   supplement his opposition to the pending dispositive motions, (Doc. 73) is **GRANTED** as

5   such.

6      **IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment

7   (Doc. 62) is **GRANTED**.

8      **IT IS FURTHER ORDERED** that Defendant Doehring's Motion for Summary

9   Judgment (Doc. 58) is **GRANTED**.

10      **IT IS FURTHER ORDERED** that the Clerk's Office is directed to enter a Final

11   Judgment in favor of Defendants and **DISMISS** this action **WITH PREJUDICE**.   All

12   parties to bear their own attorney fees and costs.   This action is **CLOSED**.

13      DATED this 28th day of November, 2011.

14

15

16                              David C. Bury
                                United States District Judge
17

18

19

20

21

22

23

24

25

26

27

28